**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Dr. Genick Bar-Meir,** **Civil No. 00-1666 (RHK/SRN)**

**Plaintiff,**

**v.**

**REPORT AND RECOMMENDATION**

**North American Die Casting Association,**

**Defendant.**

---

Dr. Genick Bar-Meir, pro se Plaintiff.

Debra Stanek, Esq. and Dean Eyler, Esq. on behalf of Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above entitled matter came before the undersigned United States Magistrate Judge on February 23, 2001, on Defendant's Motion for Summary Judgment on the Counterclaim and Complaint. (Doc. No. 26.) This motion has been referred to the undersigned pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

For the reasons set forth below, this Court recommends that Defendant's Motion for Summary Judgment on the Complaint and Counterclaim be granted.

## I. BACKGROUND

Defendant, North American Die Casting Association ("NADCA") is a not-for-profit technical and trade association for the die casting industry. (Twarog Decl., Doc. No. 30, ¶ 2.) Die casting is a manufacturing process for creating metal parts that are used as components in consumer, commercial, and industrial products. (Id. ¶ 3.) With 308 corporate members and

FILED MAY 11 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

more than 3,400 individual members worldwide, NADCA is the only trade association in the United States that represents die casters and die cast suppliers. (Id. ¶ 4.) NADCA seeks to meet the technological and educational needs of the die cast industry by sponsoring research programs, compiling business statistics, publishing technical and management materials, tracking federal policy issues, and expanding the markets for die castings. (Id. ¶ 5.) NADCA operates an internet website at www.diecasting.org. (Id. ¶ 6.) The website provides information on the die casting association, advertising, and other general die casting information. (Id.) NADCA uses broadcast emails to alert its members of upcoming conferences, courses, registration reminders, publication release notices, and legislative alerts. (Id. ¶ 7.)

The trade name NADCA has been used by the North American Die Casting Association since its inception in 1989. (Id. ¶ 9.) The die casting association owns two federal trademark registrations, one for the mark NADCA and another for the NADCA logo. (Id.) NADCA has been successful in preventing the unauthorized use of its marks by others in the die casting industry. (Id. ¶ 10.)

Plaintiff Genick Bar-Meir is a die cast engineer, and claims to be "the most widely known scientist by far in the area of die casting." (Compl. ¶ 5.) Plaintiff was a member of NADCA and has, in the past, submitted and published articles in NADCA's trade publications. (Twarog Decl., Doc. No. 30, ¶ 11; Compl. Ex. 28.) Plaintiff also submitted his research to Defendant and made repeated requests for a research grant. (Mem. in Opp., Doc. No. 42, Ex. X.) Plaintiff wrote a book on the die casting process entitled The Fundamentals

of Die Casting Design and submitted his work for Defendant's review. (Mem. in Opp., Doc. No. 42, Ex. T.) Defendant disagreed with Plaintiff's findings and concluded that the Plaintiff extends his theories beyond practical die cast parameters and extends his calculations to decimal places that are unrealistically controllable in a modern die cast facility. (Mem. in Opp., Doc. No. 42, Ex. L.)

After Plaintiff was unable to make his scientific advances available to the die casting community through NADCA, Plaintiff registered the domain name www.nadca.org. for the purpose of "making the die casting industry profitable via inserting [sic] science and technology." (Mem. in Opp., Doc. No. 42, Exs. P, T.) Plaintiff's "NADCA" stands for "Network Advance Die Casting Assistance." (Mem. in Opp., Doc. No. 42, p. 31.) On his website, Plaintiff offers free on-line die casting classes, advertises his book, The Fundamentals of Die Casting, and offers free advertising. (Pl.'s Ex. T; Countercl., Ex. E.)

Plaintiff asserts that his material is "superior" and believes that only his methods of die casting are correct. (Answer to Countercl., Doc. No. 6, ¶ 7.) Plaintiff believes that Defendant is inappropriately teaching erroneous material that violates the laws of physics and sponsoring erroneous research in the field of die casting. (Mem. in Opp., Doc. No. 42, Exs. J, Q.) According to Plaintiff, his website "nadca.org" serves as an outlet to show what is truly going on in the die cast industry. (Answer to Countercl., Doc. No. 6, ¶ 7.) Plaintiff contends that Defendant was not interested in his website until it became "famous," after which, Defendant allegedly harassed Plaintiff's web provider by requesting that he close the website. (Compl. ¶ 10.) Plaintiff asserts that Defendant further harassed him in writing by

asking him to leave the field of die casting and by writing a letter to Mark Yudof. (Compl. ¶ 8.)

After starting his website, Plaintiff contacted existing NADCA members through broadcast emails and sent messages such as the following:

> Hi,
>
> We would like you to know that you have an opportunity [sic] put a free ad on the Die Casting Bulletin Board. You need only to supply the html files and if you would like you can put small graphical files [sic]. We reserve the right to refuse/edit the ads. For your information, we have [sic] average of 50 visitors a day.
>
> For more information contact
> genick@nadca.org
> www.nadca.org

(Countercl., Ex. D; see also Skoff Decl., Doc. No. 29; Allen Decl., Doc. No. 28; Walker Decl., Doc. No. 31.) Jerald Skoff, an advertiser on Defendant's actual website, www.diecasting.org, believed that NADCA had an additional website. (Id.) It wasn't until Mr. Skoff contacted NADCA President, Daniel Twarog, over concern that his advertising material might be edited, that he learned that Defendant NADCA did not run the www.nadca.org site. (Skoff Decl., Doc. No. 29, ¶ 6.) Another advertiser, Terence Allen, also believed that Plaintiff's email messages were from NADCA. (Allen Decl., Doc. No. 28, ¶ 3.) Because of this belief, Mr. Allen forwarded a message from Plaintiff to one of his employees. (Id., ¶ 5.) Mr. Allen testified that he would not have forwarded the email message had he known that the message was not from Defendant NADCA. (Id., ¶ 6.) Similarly, Gary Walker, a NADCA member, also received broadcast emails from

"nadca.org" (Walker Decl., Doc. No. 31.) In late 1999, Mr. Walker received an email from "nadca.org" offering educational programs relating to die casting. (Id., ¶ 3.) Because Mr. Walker has used and been happy with NADCA's training programs in the past, he forwarded the message to engineers and scientists at his company asking them to consider sending newly hired engineers to the programs. (Id., ¶¶ 3-4.) It was only after he forwarded the message that he learned that the message was from Plaintiff and not from Defendant NADCA. (Id., ¶ 5.) According to Mr. Allen, the "nadca.org" email messages mimicked the broadcast emails that NADCA sends to its members. (Id.)

In April 2000, NADCA initiated an arbitration proceeding challenging Plaintiff's registration and use of "nadca.org" as his domain name with the World Intellectual Property Organization ("WIPO") Arbitration and Mediation Center pursuant to the Uniform Domain Name Dispute Resolution Policy ("UDRP") adopted by the Internet Corporation for Assigned Names and Numbers ("ICANN").[1] (Twarog Decl., Doc. No. 30. ¶ 18; Exs. A, B to

---

[1]In 1999, ICANN was recognized by the U.S. Department of Commerce as the nonprofit corporation responsible for governing the Internet. ICANN oversees the internet's infrastructure, ensures competition among domain name registrars, helps to establish domain name dispute resolution policies, and determines whether and when to add new domain name suffixes. Lockheed Martin Corp. v. Network Solutions, Inc., 2001 WL 460874, 2 (N.D.Tex.). ICANN and the U.S. Department of Commerce authorize WIPO to act as a domain name registrar and arbitrator of cases involving Internet domain name disputes. PACCAR, Inc. v. TeleScan Techs. LL.C.,115 F.Supp.2d 772, 777 n.4 (E.D. Mich. 2000). The UDRP provides for resolution of domain name disputes through mandatory administrative proceedings. Domain name registrants must agree to abide by the UDRP, which permits the owner of a trademark to initiate an administrative complaint against an alleged cybersquatter. Lockheed Martin, 2001 WL 460874, at 2-3.

Neither the ICANN Policy nor its governing rules dictate to courts what weight should be given to a panel's decision. See Weber-Stephen Products Co. v. Armitage Hardware and Bldg. Supply, Inc., 2000 WL 562470, 2-3 (N.D. Ill.) However, the ICANN Policy and its

Answer and Countercl.) Defendant challenged Plaintiff's registration of "nadca.org" and sought to prevent Plaintiff from using "nadca.org" in a manner that was deceptive, misleading, or confusing. (Ex. B to Answer and Countercl.) Under the UDRP, Defendant was required to show (1) that the domain name was identical or confusingly similar to a mark in which NADCA has rights, (2) that Plaintiff had no rights or legitimate interests in the domain name, and (3) that the domain name was registered and was being used in bad faith. (Id.) The WIPO arbitrator determined that Plaintiff's use of "nadca.org" was identical to NADCA's registered trademarks, that Plaintiff had no legitimate interest in the domain name, and that Plaintiff's use of the domain name clearly fit within the definition of bad faith. (Id.) The arbitrator ordered the domain name be transferred to Defendant.[2] (Id.)

The domain name was not transferred because Plaintiff filed this lawsuit within ten days of the WIPO decision. Plaintiff seeks the following relief: (1) that NADCA be restrained from harassing Plaintiff and his web provider; and (2) that the Court declare that the domain name "nadca.org" belongs to Plaintiff. (Compl., Doc. No. 1.) Defendant brought a counterclaim alleging federal trademark infringement under 15 U.S.C. § 1114, federal

---

accompanying rules do contemplate proceedings in federal court. For example, an arbitration panel's determination that a domain name should be transferred, will be implemented within ten days of issuance unless the domain name registrant has commenced a lawsuit against the complainant in a qualified jurisdiction. Lockheed Martin, 2001 WL 460874, at 2-3. If such a lawsuit has been filed, no further action will be taken unless a settlement has been reached, the lawsuit has been dismissed or the court has rendered a decision requiring discontinuation of the registered domain name. Id.

[2]The original WIPO decision mistakenly ordered the domain name be transferred to "Respondent" (Plaintiff Bar-Meir). This typographical error was corrected to read "Complainant" (Defendant NADCA). (Countercl., Exs. A, B.)

unfair competition under 15 U.S.C. § 1125(a)(1), and federal anticybersquatting under 15 U.S.C. § 1125(d). (Countercl., Doc. No. 4.)

## II. STANDARD OF REVIEW

According to the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue of material fact and the moving parity is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the burden of showing the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Enterprise Bank v. Magna Bank of Missori, 92 F.3d 743, 747 (8th Cir. 1996).

After a motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and "by affidavit or otherwise" designate "specific facts showing that there is a genuine issue for trial." Robinson v. Monaghan, 864 F.2d 622, 624 (8th Cir. 1989); Buford v. Tremayne, 747 F.2d 445, 447 (8th Cir. 1984) (opposing party may not rest merely upon allegations of complaint, but must set forth specific facts showing genuine issue for trial); Fed.R.Civ.P. 56(e). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining which facts are material, courts look to the substantive law in a dispute and identify the facts which are critical to the outcome. Id. A dispute about a material fact is genuine if the evidence is such that a reasonable trier of fact could return a decision in favor of the nonmoving party. Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986).

In performing the genuineness inquiry, courts view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Adkison v. G.D. Searle & Co., 971 F.2d 132, 134 (8th Cir. 1992). A court is not "to weigh the evidence and determine the truth of the matter but [instead should] determine whether there is a genuine issue for trial." Anderson, at 249, 106 S.Ct. at 2511. When a party opposing summary judgment fails its burden, summary judgment "may and should be granted" if the moving party otherwise satisfies the Rule 56(c) requirements. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## III. ANALYSIS

### A. Counterclaim Counts I & II: Trademark Infringement & Federal Unfair Competition

In Counts I and II of the Counterclaim, Defendant asserts claims under two sections of the Lanham Act, trademark infringement under Section 32, 15 U.S.C. § 1114 and unfair competition under Section 43, 15 U.S.C. § 1125(a).[3] Section 1114 prohibits the infringement of a registered mark, while section 1125(a) does not require a registered mark but simply prohibits false designations or representations of a mark. Co-Rect Products, Inc.

---

[3]The Lanham Act was intended to make "actionable the deceptive and misleading use of marks" and "to protect persons engaged in ... commerce against unfair competition." Section 45, 15 U.S.C. § 1127. Section 43(a) "prohibits a broader range of practices than does § 32," which applies only to registered marks. Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 858, 102 S.Ct. 2182, 2190-2191, 72 L.Ed.2d 606 (1982).

v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1329 (8th Cir. 1985). Specifically, section 1114 prohibits the "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. 114(1)(a). Similarly, section 1125(a) prohibits the use, in commerce, of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. 1125(a)(1)(A).

To recover under either section 1114 or 1125(a), an individual must show that the unauthorized use, of a protectable mark, in commerce is "likely to cause confusion." Home Builders Ass'n of Greater St. Louis v. L&L Exhibition Management, Inc., 226 F.3d 944, 947 (8th Cir. 2000) (Section 43(a), 15 U.S.C. 1125(a)); Anheuser-Busch, Inc. v. Balducci Publications, 28 F.3d 769, 773 (8th Cir. 1994)(Section 32, 15 U.S.C. 1114).

In determining whether a likelihood of confusion exists, courts take the following factors into consideration:

> (1) the strength of the owner's mark;
> (2) the similarity between the owner's mark and the alleged infringer's mark;
> (3) the degree to which the products compete with each other;
> (4) the alleged infringer's intent to pass off its goods as those of the trademark owner ...;
> (5) incidents of actual confusion; and
> (6) the type of product, its cost and the conditions of purchase

SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980). No single factor is dispositive. See Mutual of Omaha v. Novak, 836 F.2d 397, 399 n. 3 (8th Cir. 1987) ("These are not necessarily the only factors that might be relevant in a particular case. The ultimate inquiry always is whether, under all the circumstances, there exists a likelihood of confusion between the plaintiff's trademark and the allegedly infringing use.").

**1. Strength of the Mark**

The Court first considers the strength of the mark. "A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one." SquirtCo , 628 F.2d at 1091. Defendant argues that NADCA marks are strong because (1) Defendant owns two incontestable federal trademark registrations for the mark NADCA and the NADCA logo, and (2) Defendant has extensively used the NADCA marks in marketing, advertising, and communications. (Def.'s Mot., Doc. No. 27, p. 11.)

The relative strength of trademarks is evaluated according to four broad categories of marks which include, in descending order of strength, (1) arbitrary or fanciful marks; (2) suggestive marks; (3) descriptive marks; and (4) generic marks. General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 625 (8th Cir. 1987). An arbitrary or fanciful mark is "a word, either unknown or completely out of common usage, coined for the sole purpose of identifying products in the market place." Aveda Corp. v. Evita Marketing, Inc., 706 F.Supp. 1419, 1428 (D. Minn. 1989). Arbitrary marks are deemed the strongest "because their inherent novelty creates a substantial impact on the buyer's mind." Id. Suggestive marks subtly indicate something about the product, and require imagination, thought or perception

to reach a conclusion concerning the nature of the goods. Northland Ins. Cos. v. Blaylock, 115 F.Supp.2d 1108, 1118 (D. Minn. 2000). A descriptive mark conveys the characteristics, the qualities or other features of a product but can only be protected if the mark has become distinctive by acquiring a secondary meaning. General Mills, 824 F.2d at 625. A generic term does not indicate the source of the product or service, but merely defines a type, genus or class of services, and is not entitled to any protection. Id.

Defendant has two federally registered trademarks, one for the name NADCA and another for the NADCA logo. (Twarog Decl. ¶ 9.) The registration of a trademark is prima facie evidence of the mark's validity, the registrant's ownership of the mark, and the registrant's exclusive right to use the registered mark in commerce. 15 U.S.C. § 1115(a). Defendant asserts that its marks are strong because they have obtained "incontestible status." Incontestible trademarks are ones which have been registered and have been in continuous use for five consecutive years subsequent to the date of registration. 15 U.S.C. § 1065. Subject to a number of defenses, an "incontestible" mark is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b).

However, incontestability alone does not establish the strength of a mark. For example, a descriptive trademark, even if incontestable, may only be entitled to minimal protection because a company's trademark may be strong in one market but weak in another. See Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 260 (5th Cir. 1980) ("Domino"

mark is strong in sugar products but weak for other food products). Plaintiff argues that Defendant's mark is weak because "no ordinary person would assume that checking the web for 'nadca' would refer that person to anything remotely associated with North American Die Casting Association." (Mem. in Opp., Doc. No. 42, p.31.) As evidence of this fact, Plaintiff explains that other industries also use the acronym "NADCA," such as the National Air Duct Cleaner Association." (Id.) However, the National Air Duct Cleaner Association is a wholly separate industry from the die cast industry and their products and information are marketed to fundamentally different purchasers. Unlike the National Air Duct Cleaner Association, Plaintiff uses the "NADCA" mark in the same market as Defendant and seeks to reach the same community of people, die cast professionals. Therefore, Plaintiff's use of "NADCA" is not merely a fair use of the mark to describe a non-die casting related product or service.

In the field of die casting "NADCA" is known to refer to Defendant North American Die Casting Association, therefore Defendant's mark is strong because it is more than merely "descriptive" in the field of die casting. There is only one trade association in die casting, and that is the Defendant NADCA. Furthermore, Defendant has used this mark extensively since 1989 and is known by the NADCA mark in the field of die casting. (Skoff Decl., Doc. No. 29; Allen Decl., Doc. No. 28; Walker Decl., Doc. No. 31.) NADCA has also been successful in preventing the unauthorized use of its marks by others in the die casting industry. (Twarog, Decl. ¶ 10.) See Board of Trustees of Univ. of Ark. v. Professional Therapy Servs., Inc., 873 F.Supp. 1280, 1285 (W.D. Ark 1995) (a court may consider the inherent distinctiveness of the mark, the long-term use of the mark by the owner, the extent

of public exposure for the mark through advertising, promotion and unsolicited publicity, and the owner's actions to protect its marks).

The evidence clearly shows that Defendant's marks are neither generic nor merely descriptive in the field of die casting. Therefore, the first factor, the strength of the mark, favors Defendant.

**2. Similarity Between Marks**

Defendant contends that Plaintiff's use of "NADCA" and "nadca.org" are identical to Defendant's federally registered trademarks. Plaintiff admits that Defendant's mark "NADCA" and his use of "nadca.org" are similar. (Mem. in Opp., Doc. No. 42, p. 31.) But, Plaintiff argues that the community of die casting engineers is small and that this community of people already knows about his organization, the "Network Advance Die Casting Assistance," and therefore, Plaintiff argues, this factor should be considered neutral. (Id.)

Plaintiff's reasoning does not explain how the marks are dissimilar. Defendant clearly used the mark NADCA first and Plaintiff's subsequent use, of the same mark, even if later associated with Plaintiff as well, does not mitigate against the fact that the marks are similar. Although Plaintiff uses the name NADCA, with the addition of ".org" as the domain name for his die casting website, courts have consistently held that the use of a registered mark is not abrogated by incorporation into a domain name. "The fact that defendant adds the ".com" to plaintiff's mark is irrelevant." Northland,115 F.Supp.2d at 1119.

Defendant's mark "NADCA" and Plaintiff's use of "nadca.org" are clearly similar. The second factor, similarity, favors Defendant.

**3. Degree of Competition Between Parties**

Defendant asserts that Plaintiff directly competes with NADCA. (Def.'s Mem., Doc. No. 27, p. 12.) Although persuasive, evidence of direct competition is not needed for a finding of infringement because confusion, not competition, is the touchstone of trademark infringement. Mutual of Omaha, 836 F.2d at 399. Where the products are closely related less similarity is necessary to support a finding of infringement. David Sherman Corp. v. Heublein, Inc., 340 F.2d 377, 380 (8th Cir. 1965).

Plaintiff argues that he is not in competition with Defendant because (1) he will allow Defendant to use his material, and (2) he has a desire to see Defendant flourish "if it will teach the correct material and advance the die casting industry." (Mem. in Opp., Doc. No. 42, p. 32.) However, Plaintiff believes that Defendant is teaching "erroneous material," and has created his website and offered his materials as an alternative to the Defendant's teachings. (Compl., Exs. E, P.) Despite Plaintiff's alleged good will towards Defendant, the evidence shows that his theories, teachings, and website are competing with Defendant. For example, in a letter to NADCA President, Daniel Twarog, Plaintiff explained the following: "You claim that both of us are right. Please do not elute [sic] the die cast community that my scientific findings can coexist with North American Die Casting Association's teaching. Let me make it crystal clear. There is no possibility for B to say that both A and B are right when A says that B is wrong; only one can be right." (Mem. in Opp., Doc. No. 42, Ex. T.)

Plaintiff asserts that there is no competition because his products are offered at no charge. (Mem. in Opp., Doc. No. 42, p. 26, 34.) Plaintiff confuses financial use with

commercial use.[4] Although Plaintiff may not receive a direct financial benefit from using Defendant's mark, he is attempting to garner a commercial benefit by convincing the die cast industry that his die cast theories are superior to those of Defendant. (Mem. in Opp. Doc. No. 42, Ex. P, X (criticizing NADCA's choice of grant recipients and questioning why he was turned down for research grant funds)). Plaintiff is improperly receiving a benefit from the goodwill that Defendant has developed in its mark. In this case, each party seeks to capture the audience of die cast engineers, each seeks to explain current die cast theories through the use of classes and written material. Both parties have similar objectives, to serve the die casting community. (Bar-Meir Aff., Doc. No. 43, Ex. T; Twarog Decl. ¶ 2.) Both parties are involved in die cast research. (Compl. ¶ 5, Twarog Decl. ¶ 2.) Both parties offer training courses and materials related to die casting. (Compl., Ex. 20; Bar-Meir Aff., Doc. No. 43, Ex. T; Twarog Decl. ¶ 5.) The evidence suggests a close competitive proximity between the Plaintiff's and Defendant's classes, products, and information, all of which increase the opportunity for confusion by consumers. The third factor also favors Defendant.

**4. Intent to Pass Off Goods**

The forth factor in determining likelihood of confusion is the infringer's intent to pass off his goods as those of the trademark owner. Intent on part of alleged trademark infringer to pass off its goods as the product of another raises the likelihood of confusion, but presence

---

[4]There is no personal profit requirement in § 1114 or in § 1125. Plaintiff's materials clearly relate to the advertisement and distribution of Plaintiff's book and course materials. The word "commerce" means all commerce which may lawfully be regulated by Congress. 15 U.S.C. § 1127.

or absence of intent to confuse is not critical to finding likelihood of confusion. 15 U.S.C.A. § 1114(1)(a); Aveda,706 F.Supp. at 1429.

> It is so easy for the honest businessman, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them.

Id.

Plaintiff argues that the use of "nadca" as an acronym represents his organization, Network Advance Die Casting Assistance. (Mem. in Opp., Doc. No. 42, p. 31. ) Despite this assertion, Plaintiff has offered no legitimate rationale for choosing a name that creates the same acronym as the only other die cast association in the nation. It could have been no surprise to Plaintiff that the name of his organization mimicked Defendant's trademark. Plaintiff himself was a member of NADCA and had published works in NADCA magazines. (Twarog Decl., ¶ 9.)

Plaintiff claims to be the most well known scientist in the field of die casting, and yet he never identified himself by his full name in his email correspondence. (Compl. ¶ 5; Countercl. Ex. D.) Rather, Plaintiff signed his email genick@nadca.org. Plaintiff argues that the names "Genick," "Bar-Meir," and "Genick Bar-Meir" are so unusual, that the address genick@nadca.org is unique and lessens any confusion. However, the alleged uniqueness of his name and his status as a well known scientist cut against using the domain name "nadca.org." (Compl. ¶ 5.) When asked at the February 23, 2001, hearing, why he choose

"nadca.org" as his domain name, Plaintiff responded that he wanted to appear "like a group." The evidence shows that the "group" that Plaintiff wanted to appear like was Defendant, NADCA.

As a final matter, Plaintiff asserts that there can be no intent inferred because he has placed a disclaimer on his website. (Mem. in Opp., Doc. NO. 42, pp.32-33.) Plaintiff's warning does not mitigate against his intent because he used Defendant's mark to draw individuals to the website to offer them competing views and products relating to die casting. See Green Products Co. v. Independence Corn By-Products Co., 992 F. Supp. 1070, 1078 (N.D. Iowa 1997) (discussing the likelihood of confusion involved when a party deceptively lures consumers to a website using another's mark).

The evidence shows that Plaintiff's use of the name "nadca.org" was done with an intent to confuse the die cast community.

**5. Incidents of Actual Confusion**

"While actual confusion is not essential to a finding of infringement, its existence is positive proof of the likelihood of confusion." Northland, 115 F.Supp. at 1121. Defendant offers the testimony of three NADCA members, Terence Allen, Gary Walker, and Jerald Skoff all of whom received Plaintiff's "nadca.org" emails and were confused. (Allen Decl., Doc No. 28, Skoff Decl., Doc. No. 29, Walker Decl., Doc. No. 31.) Mr. Allen, received an email from Plaintiff advertising the book, The Fundamentals of Die Casting. (Allen Decl, Doc. No. 28, ¶ 3.) Mr. Allen believed this message was from NADCA and forwarded Plaintiff's message to his employees. (Allen Decl, Doc. No. 28, ¶ 5.) Similarly, Mr. Walker

received an email message from Plaintiff offering an education program. (Walker Decl., Doc. No. 31, ¶ 3.) Having participated in NADCA programs in the past, Mr. Walker forwarded this message to his engineers for consideration because he believed the message was from Defendant NADCA. (Walker Decl, Doc. No. 31, ¶ 4.) Finally, Mr. Skoff received an email offering advertising on the "nadca.org" website, which reserved the right to edit the advertisements. (Skoff Decl., Doc. No. 29, ¶ 4.) Mr. Skoff, an existing NADCA advertiser, was so concerned about the content of the email that he interrupted his vacation and personally contacted NADCA President Daniel Twarog. (Skoff Decl., Doc. No. 29, ¶ 6.)

Plaintiff questions the validity of these affidavits and claims that they are "only a separate attempt to stretch the truth in another desperate futile attempt to earn the Court's favor." (Mem. in Opp., Doc. No. 42, p. 34.) But Plaintiff does not provide competing affidavits, or any credible evidence, to show that these men were not confused. Rather, Plaintiff argues that these men should not have been confused because they are intelligent, experienced, and have visited his website. (Mem. in Opp., Doc. Nol. 42, pp. 16-26.) These facts do not diminish the fact that these NADCA members were actually confused when they first received Plaintiff's email from "nadca.org."

There is definitive evidence of actual confusion in this case, therefore, the fifth factor also favors Defendant.

**6. Conditions of Purchase**

Finally, the Court considers such factors as the type of product involved, its costs, the

conditions of purchase, and the degree of care to be exercised by potential customers in making their purchasing decision. SquirtCo., 628 F.2d at 1091. The products in this case are die cast educational classes and materials offered through email solicitation. The target of Plaintiff's emails and website is the die casting community; individuals who presumably have a high level of sophistication in the field of die casting. This fact suggests that the die cast community would exercise a high degree of care in reviewing die cast books and choosing die cast educational programs. However, the evidence shows that three members of NADCA exercised a low degree of care in reviewing email messages and were confused. (Allen Decl., Doc No. 28, Skoff Decl., Doc. No. 29, Walker Decl., Doc. No. 31.)

Although this factor is inconclusive, "[t]he ultimate inquiry is whether, considering all the circumstances, a likelihood of confusion exists that consumers will be confused about the source of the allegedly infringing product." Hubbard Feeds Inc. v. Animal Feed Supplement Inc., 182 F.3d 598, 602 (8th Cir. 1999). Upon reviewing the evidence, the Court finds that five of the six factors weigh strongly in favor of Defendant. There is no genuine issue of material fact as to the likelihood of confusion in this case and Defendant is entitled to judgment as a matter of law. Therefore, the Court recommends that Defendant's Motion for Summary Judgment on Counts I and II of the Counterclaim be granted.

**B. Counterclaim Count III: Anticybersquatting**

Count III of the Counterclaim asserts a claim that Plaintiff violated the Anticybersquatting Consumer Protection Act ("ACPA"), Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d). Section 1125(d) provides, in relevant part:

(d) Cyberpiracy prevention

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that-

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. 1125(d)(1)(A); see also Northland, 115 F.Supp.2d at 1123 (noting that to succeed under the ACPA claim a plaintiff must show that: (1) plaintiff's mark is distinctive or famous; (2) defendant's domain name is "identical or confusingly similar" to plaintiff's mark; and (3) defendant used, registered, or trafficked in the domain name with a bad faith intent to profit from the sale of the domain name.) The first two factors are clearly met in this case. Defendant has two registered trademarks in NADCA and the NADCA logo. (Twarog Decl., Doc. No. 30, ¶ 9.) Plaintiff's domain name, "nadca.org" is nearly identical, and confusingly similar, to Defendant's registered mark.

As to bad faith, the ACPA provides nine nonexclusive factors to assist a court in assessing whether a party had the requisite bad faith intent. 15 U.S.C. § 1125(d)(1)(A). Five

of the factors are relevant to our inquiry and include:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

15 U.S.C. 1125(d) (B)(i).

As discussed above, Defendant has an incontestable registered trademark in the name NADCA and the NADCA logo, and has used these marks consistently in its advertising, sales, and marketing since 1989. Plaintiff's legal name is not NADCA nor has Plaintiff offered any bona fide or fair use of Defendant's mark. Rather, the evidence clearly shows that Plaintiff intended to divert consumers from Defendant's site in attempt to tarnish and disparage Defendant's mark. For example, Plaintiff sent email messages that were signed NADCA and sent these messages to NADCA members. (Allen Decl., Doc No. 28, Skoff Decl., Doc. No. 29, Walker Decl., Doc. No. 31.) These email messages included a link to "nadca.org" and offered advertising opportunities, die cast classes and materials. (Id.) The

signature line caused actual confusion and NADCA members testified to believing that Plaintiff was NADCA. (Id.) In addition the website vehemently criticized the NADCA president and proclaimed that Defendant's classes, materials, and die cast methods were based on principles that violated the laws of physics and then offered alternative classes and materials. (Compl., Ex. 21, Mem. in Opp., Ex. E.)

The evidence, including Plaintiff's own submissions and allegations, demonstrates that there is no question of material fact on Defendant's claim of cybersquatting, and Defendant is entitled to judgment as a matter of law. Therefore, this Court recommends that Defendant's Motion for Summary Judgment on Count III of the Counterclaim be granted.

**C. Complaint: Harassment and Declaration of Domain Name Ownership**

The Complaint seeks the following relief: (1) that Defendant be restrained from harassing the Plaintiff or his web provider, and (2) that the Court order that the domain name "nadca.org" belongs to the Plaintiff.[5] (Compl., p.3.)

For the reasons set forth above, the issue involved in Plaintiff's second claim for relief has been resolved in Defendant's favor. The Court finds that Plaintiff's use of "nadca.org" is likely to cause confusion and is in violation of the Lanham Act. Therefore, Plaintiff is not entitled to a declaration that "nadca.org" belongs to Plaintiff. As to the claim of harassment,

---

[5]Plaintiff also asserts that there were procedural mistakes made in the WIPO arbitration, specifically that (1) there was no reasoning given for the July 10, 2000, and the July 12, 2000, arbitration decisions, and (2) he was not given a copy of the opinion in readable format. (Compl. ¶¶ 11-15.) Plaintiff does not assert a prayer for relief for these alleged violations and the Court is unable assist Plaintiff in this matter. Furthermore, the Court notes that (1) the arbitration decisions did contain reasoning, (Counterclaim, Exs. A,B), and (2) the UDRP Rules require a copy of the decision to be published on a publicly available website. UDRP Rule 16(b).

the Court finds that the two allegedly harassing letters do not give rise to a cause of action because there is no legal or factual basis for such claims. (See Compl. Exs. A, B.) Nor is there a legal or factual basis for Plaintiff's final claims, as presented in his memorandum in opposition to summary judgment; in which he requests that the allegations of Mr. Allen, Mr. Skoff, and Mr. Walker be investigated for fraud and "Court contempt" as being "purely a shtick;" that Plaintiff be awarded costs, penalties, and attorneys fees; and that Defendant's Counterclaim be dismissed.

This Court recommends that Defendant's Motion for Summary as to claims set forth in the Complaint be granted and Plaintiff's Complaint be dismissed in its entirety.

**D. Damages**

Having determined that Defendant is entitled to summary judgment on the Counterclaim and the Complaint, the Court turns to the issue of damages.

Courts "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." 15 U.S.C. § 1116. As already mentioned, it is clear that Plaintiff has used Defendant's marks to deceive, or at least to confuse, the public. Plaintiff is entitled to injunctive relief against any further use of Defendant's trademarks. Therefore, the Court recommends that Plaintiff be permanently enjoined from (1) using or attempting to register the term NADCA, or any reproduction, copy, or colorable imitation or variation thereof, as part of a domain name on or in

communication with advertising, distribution, sale or offering for sale of products or services; and (2) performing any other act that is likely to lead the public to believe that any product or service advertised, distributed, sold, or offered for sale by Plaintiff is licensed, sponsored, or approved by, or otherwise affiliated with, Defendant.

In addition, the Court also recommends that Plaintiff immediately transfer the domain name "nadca.org" to Defendant. See 115 U.S.C. 1125(d)(1)(C)(authorizing courts to order the forfeiture or cancellation of the domain name or transfer the domain name to the owner of the mark).

As a final matter, Defendant may seek monetary damages by electing to recover the infringer's profits, damages sustained, and costs of the action (15 U.S.C. § 1117(a)), or by electing an award of statutory damages in the amount of not less then $1,000 and not more than $100,000 (15 U.S.C. § 1117(d)). Defendant seeks damages under either or both of these statutes, including reasonable attorney fees. (Counterclaim, p. 14.) Based on the current record, the Court is not prepared to assess damages without a more specific request under either 15 U.S.C. § 1117(a) or 15 U.S.C. § 1117(d). Defendant is required to make such a demand by **Friday, May 25, 2001**, after which the Court will establish a briefing schedule on this issue.

## IV. RECOMMENDATION

Based on the foregoing, and all of the records, files and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant NADCA's Motion for Summary Judgment (Doc. No. 26) on the Counterclaim be **GRANTED** and that:

(a) Plaintiff be permanently enjoined from using or attempting to register the term NADCA, or any reproduction, copy, or colorable imitation or variation thereof, as part of a domain name on or in communication with advertising, distribution, sale or offering for sale of products or services; and

(b) Plaintiff be permanently enjoined from performing any other act that is likely to lead the public to believe that any product or service advertised, distributed, sold, or offered for sale by Plaintiff is licensed, sponsored, or approved by, or otherwise affiliated with, Defendant,

(c) Plaintiff immediately transfer the domain name "nadca.org" to Defendant,

(d) Defendant be required to present a more definite request for damages by **Friday, May 25, 2001**;

2. Defendant NADCA's Motion for Summary Judgment (Doc. No. 26) on the Complaint be **GRANTED**; and

3. Plaintiff's Complaint be **DISMISSED WITH PREJUDICE**.

Dated: May 11, 2001

Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation within 10 days after being served with a copy thereof. The party shall file with the Clerk of Court, and serve on all parties, a writing which specifically identifies those portions of this Report and Recommendation to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.